May it please the court. I've had the benefit of hearing the argument, so I think I have some preview of what are some of your concerns. So I did want to start out because there was a lot of discussion earlier about sort of the judgment of the officials, so I did want to make clear that in our case, the officials said that their judgment was there was no need for strip searches. So in Florence, where the court placed a lot of emphasis on giving deference, as Turner successfully does, that's really not a consideration here. This was an argument of the lawyers post hoc. The people who, the wardens, the Commissioner Flanagan, they basically said there was no, another official who was the security officer, they said there was no need for strip searches. And they denied the policy until Florence came along, because originally they thought it was unconstitutional. So I think that's an important fact here, but having previewed that, I want to start with the question of clearly established, because there was a lot of discussion here. In this case, unlike the other case, the only issue here is qualified immunity. That's correct. It didn't reach the substantive constitutional issue. Well, because, well, you have to establish that it was, you have to get to the clearly established. Right. You can do it. So I'm going to focus initially on the clearly established prong, because I think that's . . . I just mentioned one, ask you about one factual matter. It says that, these are the named plaintiffs here, that West shared a group holding cell with at least 55 distinct arrestees being booked, and that Saunders shared a group holding cell with 20 distinct arrestees. They may not have been all at one time, but fluctuating in and out. And then Mr. Hague and Mr. Washington and Mr. Adams each shared a cell with 35, 36, and 36 distinct arrestees. And wouldn't that qualify as being in the general population? Absolutely not. The booking floor is by definition, and everybody who was deposed was very clear on this, it was a booking floor separate from the general population. It had no beds. It was a temporary holding. You went in for benches for a short period of time before you were taken . . . Some of their cellmates had been charged with major offenses ranging from armed robbery to first degree assault, distribution of cocaine and heroin. So, and that brings us . . . I'm going to go to the footnote in Justice Alito's concurrence. In his concurrence, in a footnote, Justice Alito points to one, the practice of the Bureau of Prisons, which is . . . And remember, there are multiple holding cells on the booking floor. So, it would have been very easy for them to say, this person is arrested on this charge. Here's the room for these types of charges, and here's the room for these types of charges. And Justice Alito . . . Which says explicitly . . . Let's see if I can find it here. He says, it also . . . This is Justice Kennedy's majority opinion, which Justice Alito joins. It also may be difficult to classify inmates by their current and prior offenses before the intake search. That's number one. And then he says, exempting people arrested for minor offenses from a standard search protocol may put them at greater risk . . . and result in more contraband being brought into the detention facility. And this is the part of the problem I'm having, is that so much attention is being devoted to these concurrences. And what we're doing is, we're overlooking the fact that the concurring judges actually signed up with the majority opinion. And the majority opinion says, it's difficult to . . . You want to have all this stuff done the very minute they arrive at a facility. But the majority says, it's difficult to classify inmates right before the intake search. And the argument was made that you exempt people from minor offenses on the intake search. And the Supreme Court bats the argument down. And it says, exempting people arrested for minor offenses from a standard search protocol may put them at greater risk . . . result in more contraband brought into the detention facility. And I, you know, I think the majority opinion must have some weight here. At the very least, with respect to qualified immunity. Which I guess is, it may be the only question before us here. Well, I think two points. One is, Justice Alito in particular, but also Justice Roberts, were very clear. But Justice Alito was explicit that he joined the opinion because it was limited to the general population. And Justice Kennedy said, the question before us . . . But how are the officers supposed to figure all that out? Well, this is why I was pointing to the footnote. In fact, people do it. Justice Alito pointed to the Bull decision from the Ninth Circuit. When the Ninth Circuit held that strip searches were legal for the general population. They said, this does not disturb our long-standing rule regarding pre-arraignment . . . before people have been put in the general population. The Bureau of Prisons does that routinely and Justice Alito noted that. Jails all around the country. Remember, that until the Boehm and Powell decisions, which are far after the events in this case . . . Every circuit in the country, including this one, had systematically held that minor people arrested on minor charges . . . could not be strip searched until there was a . . . they at least appeared before a magistrate. I want to make sure I'm getting some confusion in terms of where we're going here. I do agree that the two concurrences condition the majority opinion and you cannot ignore them. I mean, they make it very clear, the reason, so they limit the majority opinion. You only had five in the majority and two of them conditioned their concurrences. But, be that as it may, what then comes along is we have qualified immunity. You've got the constitutional prong of it and you've got the clearly established. It's a clearly established part we're dealing with here. And, there's a Sixth Circuit case, the T.S. case, that seems to do what the district court judge did here. That is, looked at the presence law and said, well, that shows it wasn't clearly established or that's the basis of it. When I think what we ought to be doing is looking at the law as it existed at the time that the act was occurred. Right. Which is, you know, I've got to disagree with the Sixth Circuit on that. I just cannot understand how you can change and say it's okay to ignore a circuit precedent in your circuit when the Supreme Court comes around and reverses it. But, I think that's the point we've got here. And, the question here is, was the law at the time they were doing this, was it clearly established? And, the answer to that is yes. I agree that Logan B. Yes, it was clearly established. Yes, it was clearly established that you could not do the types of strip searches involved here. Where in the world was it clearly established? I will explain my perspective on that. Logan B. Sheely. No, you have to wait and let the judge answer. I'm sorry, I apologize. I don't want to shout over you. We talked about these holding cells with 55 arrestees. And, we talk about 20 arrestees and 35 and 36 distinct arrestees. How is that possibly analogous to the Logan case and the Amici case? Which are the cases, both in the last case and this case, that are repeatedly referred to. Where a single individual is held in a single holding cell and is searched under very demeaning conditions. Where, in some cases, members of the opposite sex are conducting the search. In other cases, there were bystanders who were able to look at a half-naked individual being searched. But, you know, in law, context is so important. And, isn't the context of Logan and Amici just worlds apart from a large city's automated booking system with all these people together? And, how can you draw from those two cases a rule of decision for the defendants in this case? A clearly established rule of decision. Okay. I'm going to be quiet now. Okay. I don't want to listen. So, my answer is that the language of Logan is very broad and speaks exactly to this situation. But, you can't take Logan by itself. Logan was the first post-Bell case to address this issue. Every circuit in the country that addressed it afterwards, and I think it was nine altogether, over the next 10 to 15 years, addressed it citing Logan and holding that in exactly our situation, it was unconstitutional to strip search people who were arrested on minor charges where there was no reasonable suspicion before they had appeared before a magistrate. And, I don't remember the full name. I'm doing this from memory. I haven't read the case in a long time. But, there was a series of cases in Maryland, if I remember correctly, the Smith cases, where applying Logan and the other cases, the district court ruled unconstitutional the type of searches that we're having here. Do you think it makes no difference that the Supreme Court said what I indicated and cut back on that? I think it makes no difference. It may make a difference on the second prong of qualified immunity, whether it was constitutional. It makes no difference on the first prong because the first prong is a question of fair notice. One other point on why it was clearly established is that the Supreme Court has been very clear that a consensus of circuits, and until Boehm and Powell, there was a total consensus of circuits. These events all occurred before those cases. So, I recognize that the constitutional issue is maybe up in the air as a result of Florence. But, the clearly established prong, because the… The Supreme Court doesn't generally grant certiorari because everything is just cut and dried and there's a consensus of circuits. The Supreme Court grants certiorari as a general matter because the law is in a state of flux and confusion. But, the law emerged into a state of flux and confusion after the events here. At the time of the events here, there was no confusion. There was no question. It was called into question later. So, the purpose, as the Supreme Court said in Brousseau… Why did the Supreme Court take the case? Because normally, as I say, they take it, they grant certiorari where there's a circuit conflict or where the circuits are at odds with one another or where there's something… There was a circuit conflict that emerged as a result initially of Powell. The Powell decision from the 11th Circuit and then other decisions followed. And then there was a split in circuit law. The 9th Circuit had revisited its previously clearly established law. Let me ask you this. Did Logan apply bail? Didn't the Logan decision apply the bail case? Isn't that correct? Yes, it did. Did bail have a bright line test or a balancing test? Bail clearly had a balancing test. Right. So, now after the fact, courts, people operating under the law, have to apply the balancing test. For purposes of qualified immunity, how would it be clearly established unless those facts present in an instant case were almost identical to the facts under which the balancing test had been applied? We could argue about it. We could argue any set of . . . I don't mean you, me personally, but people could argue under the balancing test whether that fact matters or that fact doesn't matter, how much weight you give to that. But doesn't that balancing test in this situation leave at least open to question what you do in another different factual scenario? I don't think so here when you look at the consensus of cases. First of all, Fourth Amendment jurisprudence by definition is totality of the circumstances and reasonableness under the totality of the circumstances. So, it can't be that you can't have clearly established law in the Fourth Amendment area. So, what happened in this case, in this situation, more than most Fourth Amendment situations, was that there was a very robust body of law that developed, and it consistently . . . Wait a second. On the Fourth Amendment law, you're talking about totality, but there are bright lines established on the Fourth Amendment. There are some bright lines. There's a lot of them, I think. But a lot of the situations in which the law is reasonably . . . is clearly established . . . Isn't that what you look to in Fourth Amendment to see? If that law was clearly established on that point, in other words, an officer can't come in the house at night, break in, and steal information from you. No balancing test. An officer can't do that. So, that is a bright line test, isn't it? That is a bright line test. But if you looked at the body of law that developed emerging from this court's decision in Logan, there was a bright line test. If you were arrested on minor charges, you did not have reasonable suspicion, you did not strip search them until at least they appeared before a magistrate. How much did the factors in each instant case go into the balance of whether or not you could . . . They didn't. Most of those cases were class actions that established clear rules for the general standard. They were not individual. Logan was an individualized situation, but there were many, many decisions that were in the context of class action cases where the courts addressed the rule and in the . . . You think it was clearly established then, after Logan applying bail, that there was no balancing act under class actions? No, I'm not saying there was no balancing act. The balancing test was that if you were arrested on a minor charge, you had no reasonable suspicion and you had not appeared before a magistrate, you did not have a reason to strip search. Do you think the Logan question about the public area mattered at all? About the search being conducted in a relatively public area? The court mentioned that, but you think that's of no import? I'm not saying it's of no import, but I don't think it changes the determination here. Obviously, the court was concerned about that in the context of Logan. I can understand why you wouldn't do it, but the question isn't what you would think. The question is, was it clearly established that under the facts in front of us, an officer would know it was clearly established that he could not do what he did? And I think the answer to that is that there were injunctions in Maryland prohibiting the types of searches here issued by district courts based on Logan and the other decisions that when you took Logan and the fact that Logan was cited by all these other circuits for the general proposition that I've stated, that they were on fair notice. And by the way, the defendants believed they were on fair notice. They never contended otherwise until the Florence decision. They never came in early and said, we didn't know what the law was. They never said that. There's a reason for that. Thank you, counsel. Thank you. Mr. Brockman, let's hear your side of it. May it please the court. The district court's judgment should be affirmed. The court was right to grant summary judgment on qualified immunity grounds to the two defendants that I represent in this case. The judgment can be affirmed on three separate bases, two closely related and one somewhat distinct but also related. First, on the ground that Judge Blake herself used where she exercised her discretion as this court is also free to do to proceed to the second prong of the qualified immunity analysis under Saucere, allowed under Pearson, and to determine that whatever the law is today, it was not clearly established at the time that these people served as wardens of central booking that the searches alleged by the plaintiffs here violated their rights. That fully resolves the claims in this case. There is no remaining claim for injunctive relief. It's only for monetary damages, so it would be fully dispositive of the claims in our case. How is that position correct under Logan? That decision is correct with or without Logan. Logan does not provide . . . When I asked you that, I said, how is it correct under Logan? What I mean under Logan is Logan being a current decision at the time your clients acted, how were they protected by qualified immunity given the holding in Logan? Well, we start with the preeminent guidance that our clients were entitled to look at, and it's an objective inquiry. That is Bell v. Wolfish. Now, Bell v. Wolfish does not introduce the distinctions that the plaintiffs are relying on here, much less the ones that are the basis for their claims. Recall, the class of plaintiffs that was certified here is defined by three elements. One, that they were charged with misdemeanors or not felony violence charges, not drugs, and not violence. Let me ask you this. Your position is if the Fourth Circuit has looked at Bell, and they have said what Bell means, you can say it's wrong, but they've said what Bell means for the Fourth Circuit. That's not clearly established for purposes of the Fourth Circuit? It is clearly established for purposes of the Fourth Circuit, and we have no quarrel in this case with Logan. All right, so then back to then. You said the basis was that the court . . . and you were entitled to rely on Bell. I thought you said that. Did you not say that? This court purported to apply Bell in Logan. No, no, I'm just asking this. Didn't you say . . . maybe I got it wrong, but I thought you said after Logan you still were entitled to apply Bell because you thought the Fourth Circuit had misapplied Bell. A reasonable . . . I'm sorry. Right. A reasonable official in my client's position would be entitled to believe, just as many judges have decided since, that Logan v. Scheele, whatever its merits on the facts of that case, does not alter the principle rule in Bell v. Wolfish, which is exactly what the Supreme Court later clarified in Florence. They said the lower courts have been doing all kinds of things with Bell v. Wolfish. Justice Rehnquist issued a stay of Logan because he thought it was incompatible with Bell v. Wolfish. I think you're saying the same thing. I'm trying to parse through what you were saying there. But I think what you're saying is . . . and this is where T.E.S. in the Sixth Circuit, I think, went a little off base when it looked at the present law to do that. You look at the law at the time, and I think that even if a case comes around and reverses a Fourth Circuit case, it doesn't give an officer an opportunity to ignore the existing law in this circuit at the time, even if you disagree with it. You may not like it. You may say, I don't like it, or I don't think it fits. But if it fits, and if Logan fits, and I'm not saying it does one way or the other, but if it fits, then it is the law. And if you go to Judge Shedd's question, the question is, when you look at Logan, the Amici case, and the other cases that are there, do those cases establish that it was clearly established? Now, I will submit setting up clearly established is difficult. I mean, it must be beyond debate. So if I were in your position, I would go there, and it seems to me you might be going somewhere with this from my perspective, but I don't know how Judge Shedd is viewing this. But I don't think you can say that you're going to go back and just ignore this because the Supreme Court said it. I don't think you mean that. Some successor to Sheriff Clements, who conducts a search like the one that was conducted on Ms. Logan, who wants to argue that he didn't have to follow Logan because he understood Bell better than this court did in 1981, he can make that argument. We don't have to. Logan v. Sheely does not control the facts of this case. It doesn't provide the guidance that qualified immunity requires of a case. That's your point. Where you're talking about imposing damages on somebody and holding them monetarily liable, they're entitled to notice, and they're entitled to a very clear indication that what they're doing is wrong. And I think we've been reluctant to find law clearly established when there's a night and day difference between the facts of the two cases when the Fourth Amendment, whether prior to Bell v. Wolfish or afterwards, is a balancing amendment where you're talking about balancing, you're talking about different facts lead to different outcomes under the balance. And an awful lot of officers are going to be paying an awful lot of damages  to a completely different set of circumstances. That's right. I mean, it's black-letter qualified immunity doctrine that the purported clearly established law must be clearly established at a particularly high level of generality. Not at a high level of generality, but at a level. My other point is it is clearly established at the time, and I think there's something to what my colleagues are saying, and I think Judge Winn has hit on this point, that if the law is very clearly established at the time, then later cases can't... It's a little problematic to draw on a later case to say it's unclearly established if it were clearly established at the time. But your point is it wasn't clearly established at the time, and somebody reading that case could say, well, if we avoid the pitfalls of Logan and don't conduct these searches in view of other people, and we have men searching women, which is just impermissible, and if we avoid the pitfalls that Logan set forth, then we'll have the protection of this immunity. That's right. The case, in order to provide the guidance that qualified immunity doctrine requires, doesn't have to be directly on point, but it must, as Your Honor pointed out, put the question beyond debate. And the terms of the debate... Listen, you think Logan doesn't control because of the way the court applied the law or the facts of Logan, which is it? Both. Okay, tell me why so. The facts of the case... Just to mention this, did the court apply bail? It purported to. Of course, it reached an outcome contrary to... If it purported to at the time that it did it for purposes of this circuit, it did at that time. That's right. And now later on, you can come back with the purported to business, but at the time we're talking about, it did apply. Purported might be your opinion, but you don't get to give opinion on something when the court states... When a decision comes from this court, you don't get the opportunity to say, it purports to do this so we can kind of go... If it doesn't, it doesn't. And then maybe later on it's shown that it kind of purported to. Right. The Supreme Court granted cert in Florence to resolve a question because the law was not clear. There was not a robust consensus about the exact terms under which a cert could be applied. Your claim it was unclear in the Fourth Circuit is the question. Do you say the law was unclear after Logan in the Fourth Circuit? The principles to be applied were unclear. Their application to a particular set of facts was clear. When you say principles, what general law principles are you talking about? Well, so Mr. Litt, for instance, it's referred to a series of cases decided by a district court, Smith v. Montgomery County. Do you think it's your argument that Logan, if it established... Your argument is if Logan established something, it established it more closely or it established it in a situation of facts more closely to the same as Logan? Do you think it's fact determinative? In other words, if you change the facts of Logan, then that would not prevent a lawyer from having qualified immunity under another set of facts. If you change the facts enough, then it does not disentitle the official to qualified immunity. How do the facts change between Logan and this case? Well, there are two principles that have been attributed to Logan, whether or not Logan actually expresses them. Just say the law was not clear as it applied to the conduct of these particular individuals, and rather than principles here and principles there, talk about the facts and the fact that the facts were different and that the Fourth Amendment is a factually based amendment and we deal with the facts of a particular search all the time, but you've got to give a straightforward answer to it. Not an academic answer, but a straightforward answer to how the facts were different. Well, the facts are different. I've got to agree with that. If Judge Wilkerson is going to take the law as it is but just show how the facts are different so it's not clearly established that they would have known under these facts. The facts are very different. Thank you. Please allow me to explain that the distinctions that are being pressed in this appeal are not the distinctions that... Just wait a second. This whole discussion started when I just asked you, I asked you, under Logan, in this current case, are the facts different? They are very different, Your Honor. Don't shout at me. I'm sorry. The point is, just because you shout and it's not a complete answer doesn't make it a complete answer. Here's the point. We're just asking you, just tell us what facts are different, in your opinion, between the facts in this case and in Logan whereby Logan doesn't mean that you can't do what you did in this case. Just say those facts. On the facts, Ms. Logan had already been arraigned, so to cite that case as standing for the proposition that pre-arraignment searches are subject to a different standard than others just doesn't make sense. It's nonsense. There was no security justification offered and none discernible in that situation. She had already been ordered release. The only problem was she was drunk and was waiting for her ride. She was held in a cell by herself. She had no opportunity to exchange contraband. She had no opportunity to introduce it. She had no opportunity to be hurt by somebody else who shared a cell with her and had brought in contraband. All of those facts are different from the situation at Central Booking where there are 400 people some days arrested. The officers at the Sally Port do not know the charges. They may know an arrest charge. There's an example of what's called a tow tag. This is the only information they know at the time that they have to make the search. Was the search in Logan more public than the search in your case? Do you know? There are indications that it was more public because it could be viewed by outsiders because of malfunctioning blinds in the room. Some of the people searched in our case alleged. How did you get that whole answer 20 minutes ago? Your Honor, I'm trying. I apologize. I may have mistook the importance of the Court's questions. I don't think it matters whether the Sixth Circuit's formulation of how you approach this is right or not. Do we talk about law becoming unsettled or do we talk about later law demonstrating that what people previously thought was settled wasn't so settled after all? That's certainly what's happened here. That's a big distinction. If you look at becoming the law, what it is with the Sixth Circuit and what it was at the time, which is what it looked like everybody should be doing, that's a different thing. But I agree with Judge Wilkerson. I don't think this is something. This is not antagonistic. We're just discussing the law. I think what Judge Wilkerson is pointing to is let's just deal with the clearly established problem of qualified immunity. We're not dealing with the constitutionality. We're not dealing with all that. When you're going there and you take Logan and you respect the law of the Circuit at the time, no matter what you might feel about it now, but at the time that was the law, then look at the facts that exist in this case and the facts in that case and say, well, was it clearly established? Then if you're able to convince us it was not clearly established, I think that's the end of your case. We don't have to go constitutional. We're going to do anything else on this case. I think very little persuasion is involved in demonstrating that it was not clearly established. If there were doubt, that doubt has been resolved, as Judge Blake recognized, by the subsequent developments in the law which have repudiated some of the principles that were attributed to Logan. For instance— We don't need to do that. I keep coming back to that. You don't need to go there. We don't need to go there. I agree you needn't, but I think it's an appropriate rejoinder to the claims in this case to recognize that we are talking about a class of plaintiffs, a class that is defined to have three characteristics. One, the nature of their charges. Two, the absence of reasonable suspicion. And three, having been searched at a facility like Central Booking. The first two, the Supreme Court has clarified, have no place in the analysis. It doesn't matter whether there's reasonable suspicion. That's not a workable categorical standard the Supreme Court has explained. The second one, the nature of the charges. The Supreme Court has also said that that's not a workable distinction, and in the facts of this case it wouldn't be— It seems a matter if there's a reasonable suspicion. I mean, when you start up with Fourth Amendment searches, there's always some—that right is a constitutional right. It's just there. So then you begin to create these instances, well, we can search in some instances. We can do some—and here's the standard. We're going to look at this by. Reasonable suspicion is way down on the totem pole on that list. I mean, you can—it's very subjective. Reasonable suspicion doesn't take much to articulate that. Well, here's an instance where you don't even need that. But you do have to start there, and if you start there with someone who's not going into the general population, someone who, in Mrs. Logan's case, not even pat it down, she's publicly humiliated with this, that's a whole different—that's a different scenario. And the court says, well, you can strip search her, but you've got to have reasonable suspicion to do Mrs. Logan in this case, and you didn't have it. So that's the importance of reasonable suspicion from the beginning. I mean, it's not something to throw away. And we've got to keep in mind we're talking constitutional rights here. Our citizens are entitled to them. You're not just entitled—this is not a foreign country where you can just run them in and say strip search, and we're going to figure out some court judicial rules that allows every citizen, because of the nuanced language that we use up here and the acute words that it doesn't matter who it is, you're going to be strip searched, and that's just the way it is, and we can fix the facts, so every time you're going to be strip searched. No one underestimates the degree of intrusion into privacy interests that strip searches represent. That's not an issue in this case. The court talks about it, and this is the policy aspect. We've gotten into it. It's humiliating. I mean, to make someone take their clothes off, I mean, people put clothes on for a reason. They don't want to be put in a position where it's— and no telling what's under the clothes. I mean, you've got to take them off. You've got to show them, and you bury yourself out in the public. I mean, there are strong rules against that sort of stuff, all kinds of pornographic stuff out there that don't even allow you to do it legitimately. Here you are being forced to do it against a constitutional violation, and you don't even have to have reasonable suspicion in some instances, and that's where we begin to limit it. But the only question, it seems to me, that you need to deal with is to look at the Logan cases and the other cases in the circuit and say those facts are different from these facts, and a reasonable officer dealing with this type of fact would not find it beyond debate that he couldn't do it. That's absolutely correct. That's what Judge Blake found. I think it's unassailable. And, you know, there are penumbral emanations, so to speak, from Logan v. Sheely that some courts relied on in determining other searches. That is not clearly established law. Sort of the process works this way. I know you have a lot you want to say, but when judges want to ask you something . . . I apologize, Your Honor. You have to yield. I know people get excited and caught up. I know my time is short. It's understandable. In the current case, is there any indication in the record how long people waited at the jail before they had the strip search? It's more than a strip search. It's also a body cavity, you know, view. Is there any indication? It would depend on the length of the line outside the booking center. But when they got there . . . It's one of the first steps taken upon entry into the facility. And before you enter . . . Well, how does that differ to what the facts were in Logan? What were the facts on that point in Logan? In Logan, the sheriff apparently perceived no security concern because . . . No, no, no. I didn't ask you what he perceived about the procedure in that case, what happened. I'm reporting what this court said. There was no apparent security justification because there hadn't even been a pat frisk of the woman. Right. And . . . Is that a distinction worth noting? I'm asking you to make a distinction. There, the police may be, the jailers may be by their actions for an hour and a half not doing anything to Logan, to the person in that case, I'm not sure if it was Logan or otherwise, that they didn't seem to have any concern about safety. Is that a distinction that you have between a case where people are submitted close to immediately for security justifications as compared to somebody who's given no issue for an hour and a half? Absolutely, that is one of the distinctions, Your Honor. Thank you, sir. Thank you. Mr. Lipp, we're happy to hear from you in rebuttal, sir. Thank you. In terms, I did want to give the court the site in Smithsville, Montgomery County, 547F sub 592, and there are a series of other cases in the same string. These are out of Maryland in the 80s. There were, clearly applying Logan, the court held the types of searches that we're talking about here were unconstitutional. The Supreme Court has said that we look to a consensus of cases. We look first to the law of the Supreme Court, second to the law of the circuit, third to the law in the Supreme Court of the state in which you are, and also whether there's a consensus of cases. The point that we're making here is that there really was no dispute among anybody about what the law in this circuit was, including the district court below, until Florence came out. Retrospectively, the judge held that the law was clearly established. As far as I'm aware, there weren't any courts that I'm aware of prior to Florence that ever held otherwise. There were injunctions issued based on Logan in Maryland, so I think that the law was clear. In Logan, the court said that when balanced against the ultimate invasion of personal rights involved, there was no justification. Logan would not be intermingled with the general jail population. Now, general jail population is a term of art. It's always been a term of art. It means when you are classified for placement, and that's what Bell was. Bell was a general population case. Remember that the people in Bell were already held in the general population and had appeared before magistrates. When Justice Rehnquist issued the stay in Logan, no other justice of the court agreed with the stay. Everybody who applied the law understood it to be this way. Every district court in this district, before these events occurred, understood it to be this way. Frankly, every judge in any circuit asked, is there a consensus, and what was the law at the time? I'm talking about before. Now, that doesn't mean that they would agree with it, but in terms of whether or not the law sat as it did. From our perspective, what that means is that the clearly established prong is addressed, and what the court needs to do is then decide whether these are constitutional. I want to emphasize that it was the judgment of the prison officials here that there was no security need. When you were put into these group cells, first of all, you were monitored. Secondly, you were then taken out with flex cuffs, with individual escort. There was no, and then you were stripped. If you were bound over, you were stripped, searched again. You were pat-searched, and you went through a metal detector before this happened. I think what you said is simply at odds with what's in Judge Blake's opinion. I don't want to go over all of it, but she says, despite the security procedures in place on the booking floor, contraband use and exchange among arrestees is a significant problem. Staff at Central Booking have observed arrestees attempting to bring in a variety of contraband into the facility, including guns, knives, razors, drugs, cigarettes, money, cell phones, and that body cavity searches of men and women had revealed knives, drugs, razor blades, and the like. So in light of that, you say there was no security interest? First of all, that was the statement, not my statement. That was the statement of the commissioner who was in charge of the wardens. That was the statement of the wardens. So they did not think, and Judge Blake's comments do not distinguish between what was revealed as a result of a strip search. Remember, most of this gets revealed in a strip search when people use it generically because we're focused on the visual body cavity search of private parts, but a strip search generically is often used to include ears, the hair, the mouth, which were not challenging and which is where things like razor blades and things like that are hidden. So the record does not distinguish on what is actually the result of visual body cavity searches. It just talks generically, and we're not disputing that, and we're not disputing the right to do any of this except before you appear before a magistrate and before you're bound over doing the visual body cavity search. All the rest is not in question. We appreciate it very much. We'd like to come down and brief counsel and take just a brief recess.
judges: J. Harvie Wilkinson III, Dennis W. Shedd, James A. Wynn, Jr.